**UNION COUNTY, IOWA, Plaintiff,**

v.

**PIPER JAFFRAY & CO., INC., Defendant.**

No. 4:06–cv–374.

United States District Court, S.D. Iowa, Central Division.

May 27, 2011.

Kimberly Holst Blankenship, Timothy J. Hill, Bradley & Riley, Cedar Rapids, IA, Natalie K. Ditmars, Adam S. Tarr, Bradley & Riley PC, Iowa City, IA, for Plaintiff.

Terri L. Combs, Michael A. Giudicessi, Jesse Linebaugh, Faegre & Benson LLP, Des Moines, IA, Jerome A. Miranowski, Nicole N. Nayima, Faegre & Benson LLP, Minneapolis, MN, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Union County, Iowa ("Plaintiff" or the "County") filed an Amended Complaint against Piper Jaffray & Co., Inc. ("Defendant" or "Piper") on January 30, 2008, asserting the following claims: 1) breach of fiduciary duty; 2) breach of contract; 3) negligent misrepresentation; 4) negligence; and 5) fraud. Clerk's No. 47. On September 29, 2010, the Court entered summary judgment in favor of Defendant on Plaintiff's breach of contract claim. Clerk's No. 240, 741 F.Supp.2d 1064 (S.D.Iowa 2010). A jury trial was held on the remaining counts from December 6–16, 2010. See Clerk's Nos. 298, 300, 303, 305, 307, 312–13, 317. At trial, the "fraud" count was presented to the jury as two separate claims: one for fraudulent misrepresentation and one for fraudulent nondisclosure. See Clerk's No. 314.

On December 17, 2010, the jury returned its verdicts. Clerk's No. 318. The jury found in favor of Defendant on Plaintiff's claims for breach of fiduciary duty, negligence, negligent misrepresentation, and fraudulent misrepresentation. Id. The jury, however, found in favor of the County on the fraudulent nondisclosure claim, and awarded the County $1.00 in damages.[1] Id. Presently before the Court are two post-trial motions filed by the parties.

On January 20, 2011, the County filed a "Motion for New Trial on Damages," contending that it is entitled to a new trial on damages because of prejudice resulting from "errors committed at trial concerning the introduction and exclusion of evidence bearing on the question of the County's damages [and] incorrect jury and curative instructions (submitted over the County's objection)." Clerk's No. 334. The County further argues that the "jury's verdict, in assessing $1 in damages, completely disregarded the overwhelming damages testimony at trial." Id. at 1. Piper filed a resistance to the County's Motion on February 7, 2011. Clerk's No. 339. The County filed a Reply on February 17, 2011. Clerk's No. 340.

On January 20, 2011, Piper filed a Renewed Motion for Judgment as a Matter of Law (Clerk's No. 335), asserting that "the

---

1. Though Piper proffered several affirmative defenses at trial, the jury found Piper had failed to prove the defenses by a preponderance of the evidence. See Clerk's No. 318.

evidence at trial was insufficient to support a finding that the County had met its burden of proving its fraudulent nondisclosure claim."[2] Clerk's No. 335 at 2. The County filed a resistance to Piper's Motion on February 7, 2011. Clerk's No. 338. Piper filed a Reply on February 22, 2011. Clerk's No. 345. The County filed a Supplement to its resistance to Piper's Motion on February 24, 2011. Clerk's No. 347. Piper filed a response to the County's supplemental resistance on March 1, 2011. Clerk's No. 350. The matters are fully submitted.

The factual background of this case was set forth extensively in the Court's Order on Piper's Motion for Summary Judgment. *See* Clerk's No. 240, 741 F.Supp.2d at 1070–86. Because the evidence provided to the Court at the summary judgment stage was fundamentally the same as that presented at trial, the Court will not recount the factual background in this Order, except where relevant and necessary for consideration of the pending motions.

## I. PIPER'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. *Legal Standard*

Federal Rule of Civil Procedure 50(a) provides that at any time before a case is submitted to a jury, either party may move for judgment as a matter of law. "If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R.Civ.P. 50(b). In ruling on a renewed motion for judgment as a matter of law,

the Court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial, or (3) direct the entry of judgment as a matter of law." Fed. R.Civ.P. 50(b)(1). Further, in considering the post-verdict renewed motion for judgment as a matter of law, the trial court is:

> (1) to consider the evidence in the light most favorable to the ... parties prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved ... in favor of the prevailing parties; (3) to assume as proved all facts which the prevailing parties' evidence tends to prove; (4) to give the prevailing parties the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusion to be drawn from it.

*Voegeli v. Lewis,* 568 F.2d 89, 92 (8th Cir.1977) (quoting *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir. 1975)). Accordingly, the Court must focus its analysis on "whether or not the record contains evidence sufficient to support the jury's verdict." *Children's Broad. Corp. v. Walt Disney Co.,* 357 F.3d 860, 863 (8th Cir.2004).

### B. *Elements of the Claim*

As noted, the jury returned a verdict in favor of the County only on the County's claim against Piper for fraudulent nondisclosure. At trial, the Court instructed the jury on this claim as follows:

> Union County asserts a claim of fraudulent nondisclosure against Piper. Union County must prove the following propositions by a preponderance of clear, satisfactory, and convincing evidence:

**2.** Though Piper has requested that the Court schedule oral argument on its Motion, the Court does not believe oral argument will substantially aid it in resolving the matter. Accordingly, Piper's request for oral argument is denied.

1. Special circumstances existed which gave rise to a duty of disclosure between the plaintiff and the defendant.

2. While such relationship existed, the defendant was aware of one or more of the matters listed in the Instruction titled "Alleged Nondisclosures" (note that you must unanimously agree upon *which* item(s) was not disclosed).

3. While such relationship existed, the defendant concealed or failed to disclose the identified matter.

4. The undisclosed information was material to the transaction.

5. The defendant knowingly failed to make the disclosure.

6. The defendant intended to deceive the plaintiff by withholding such information.

7. The plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance.

8. The failure to disclose was a cause of the plaintiff's damage.

9. The nature and extent of the plaintiff's damage.

If Union County has failed to prove any of these propositions, Union County cannot recover damages. If Union County has proved all of these propositions, Union County may be entitled to recover damages in some amount.

Final Jury Instr. No. 40 (Clerk's No. 314 at 44).

The instruction on "Alleged Nondisclosures" referenced in the second element provided:

In its negligence and fraudulent misrepresentation claims, Union County alleges that Piper owed duties to Union County, and that Piper breached its duties by failing to disclose certain information.

Specifically, Union County contends that Piper failed to disclose the following:

1. Feasibility and engineering studies on the Project.

2. An appraisal showing that Crestland's real estate located in Creston, Iowa was worth $5,945,000.

3. Piper's belief that the $19 million minimum assessment was high in relation to the capital expenditures on the project.

4. Investigative steps Union County could have taken, such as obtaining an independent feasibility study and appraisal for the CF Project.

5. Alternative approaches that Union County could have considered in connection with entering into the Development Agreement that would have offered Union County greater protection, such as obtaining a Letter of Credit or not proceeding at all with the Development Agreement.

6. The City's participation in the CF financing through the issuance of IDR bonds.

7. Piper's work with Crestland and CF to finance the Project, and Piper's representation of the City in unrelated bond issuances.

8. Union County's financing was the sole "equity" in the Project.

9. Piper did not inquire as to whether a Letter of Credit was available.

10. That Crestland had losses in some years before Union County's participation in the CF project and execution of the Development Agreement.

11. The risks posed by the CF project, as set forth in the official statement for the City IDR bond issuance, including that the CF equipment was leased and not subject to taxa-

tion under the Development Agreement; that the cost of the CF "building and structures" was $8 million.

Final Inst. No. 28.

## C. *Analysis*

Defendant argues that judgment as a matter of law must be granted in its favor because insufficient evidence was presented at trial as to the first, fourth, sixth, seventh, and eighth elements necessary to prove a claim for fraudulent nondisclosure. The Court will examine the sufficiency of the evidence as to the elements of the claim, recognizing that "[f]raud must be established by clear, satisfactory, and convincing evidence." *McGough v. Gabus,* 526 N.W.2d 328, 331 (Iowa 1995).

**3.** In ruling on Piper's Motion for Summary Judgment at an earlier stage in the litigation, the Court dealt with elements of the claim directly pled in Plaintiff's Complaint, which was for fraud. Though Plaintiff claimed that Defendant was liable for fraud based both on misrepresentations and based on nondisclosures, the Court did not delve into the distinctions between the elements of the two types of fraud claims. At this stage of the proceedings, however, the distinction is significant. That is, fraudulent nondisclosure, unlike fraudulent misrepresentation, requires that the defendant owe a duty to the plaintiff to disclose the information at issue. *Compare* Final Inst. Nos. 39 and 40. At all times during this litigation, Plaintiff has maintained that the "duty" Piper owed was either a fiduciary duty or some similar duty arising out of Piper's alleged status as the County's "financial advisor." The jury, however, rejected the County's claims that Piper undertook to act as either a fiduciary or as a financial advisor when it found in Piper's favor on Plaintiff's breach of fiduciary duty and negligence claims. Indeed, all of the essential elements of both breach of fiduciary duty and negligence are essential elements for a claim of fraudulent nondisclosure, with the only real distinction being the duty component and the higher standard of proof applicable to a fraud

### 1. *First element—duty of disclosure.*

Iowa case law holds that a fraud claim can be actionable based on one party's failure to disclose material information to another party. In order to be actionable, however, the party sued must have been under "'a legal duty to communicate'" the information that was not disclosed. *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987) (quoting *Wilden Clinic Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975)). This legal duty typically arises from a fiduciary relationship between the parties; however, it may also be created by "special circumstances," i.e., it may "'arise[ ] from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.'"[3] *Id.* (quoting *Wilden,* 229 N.W.2d at 293).

claim. *Compare* Final Inst. No. 24 (stating elements for claim of breach of fiduciary duty are: 1) existence of fiduciary relationship; 2) breach of duty; 3) causation; 4) damage) *and* Final Inst. No. 30 (stating elements for claim of negligence are: 1) Piper owed a duty to act as a financial advisor; 2) breach of duty; 3) causation; 4) damages) *with* Final Inst. No. 40 (stating elements of fraudulent nondisclosure as including, among others: 1) special circumstances giving rise to a duty to disclose; 2) breach of duty; 3) causation; 4) damage).

Despite the Court's concern as to how the jury reached a conclusion that Piper owed a duty of disclosure based on "special circumstances," when it rejected the notion that Piper had a duty as a financial advisor or as a fiduciary, the Court is nonetheless mindful that Rule 50(b) requires it to consider the evidence in the light most favorable to the jury's verdict. Accordingly, the Court will examine whether the verdict should be allowed to stand without regard to the jury's verdicts on other counts. In considering whether Piper owed a duty arising out of "special circumstances," however, the Court will interchangeably refer to this alleged duty as either a financial advisory duty or as a duty arising out of special circumstances.

Piper argues that the only evidence submitted to the jury in support of the County's assertion of a "legal duty to disclose" was evidence that Piper made an oral statement, "I work for you," at a December 9, 1996 Union County Board of Supervisors ("Board") meeting, and that Piper wrote a follow-up letter three days later to "confirm" this representation. Def.'s Mot. Br. at 8. The County contends that this same evidence shows that Piper "went *vastly beyond* acting as underwriter for the County." Pl.'s Resistance Br. at 9. The County then claims that, "in line with" Piper's duty, it undertook several additional tasks, including acting on the County's behalf in sending a letter the next day setting out the terms of the Development Agreement, providing comments on drafts of the Development Agreement, and advising the County to move forward with financing. *Id.*

"Whether the special circumstances are such as to give rise to a duty of disclosure is generally a question of law for the Court...." Iowa Civil Jury Inst. 810.2 cmt. (citing Restatement (Second) of Torts § 551 cmt. m (1977) ("Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.")). Plaintiff bore the burden at trial to prove the existence of a duty based upon special circumstances "by a preponderance of clear, satisfactory, and convincing evidence." *McGough,* 526 N.W.2d at 331. After careful consideration and extensive review of

the record, the Court cannot conclude that the circumstances presented by Plaintiff in this case are legally sufficient to give rise to a duty on behalf of Piper.

a. *Evidence in support of duty: December 9, 1996 meeting and December 12, 1996 letter.*

Though Union County contends that Piper performed numerous tasks throughout the course of the parties' dealings that were "in line with" the duty it claims Piper undertook, it is clear that Piper is alleged to have owed the County a duty as a result of exchanges between the parties at a County Board meeting on December 9, 1996. Throughout all phases of this case, County officials have maintained that they "hired" Piper representative Tim Oswald ("Oswald") to be their financial advisor in relation to the CF Processing Development Project (hereinafter "Development Project") at their December 9, 1996 Board meeting. The County has further maintained that this hiring was confirmed by a letter from Oswald to the County on December 12, 1996.

At trial, three members of the Board testified about meeting Oswald at a Board meeting on December 9, 1996. Michael Reasoner ("Reasoner") testified:

Reasoner: This would be the meeting with discussion to decide should we do this, should we not do this as a board, and ultimately the question was asked, because we were asking different people different questions, Mr. Oswald we had asked, you know, in terms of Piper Jaffray, because of his financial expertise, you know, how can we make this happen, or should we make this happen? And I think at one point Supervisor King asked the question, because who-he was there, "But who do you work for?" And he

replied he works for the county, that he would work for us.

Pl.'s Att'y.: When the meeting ended, what was your understanding of Piper Jaffray's role in relation to the county?

Reasoner: They would advise us as to the financial soundness of what we would do. Did this make sense for a county our size.

Dec. 7 Trial Tr. at 5.[4] On cross-examination, Reasoner admitted that neither the December 9, 1996 Board meeting minutes nor any other document reflected that the County hired Piper to be its financial advisor. *See id.* at 43–44 ("Formally, formally there's not, our conversation, his reply was yes, I work for you."). Reasoner further admitted that he was aware at the time he met Oswald on December 9, 1996 that the "supervisors [knew Oswald had] had been working with the City of Creston and the co-op on the financing package that they have, [with] the developer for some time." *Id.* at 101.

Board member Michael King ("King") also testified about his belief that the Board had "hired Piper Jaffray" to be its financial advisor with respect to the Development Project. Dec. 8 a.m. Trial Tr. at 26.[5] According to King, the December 9, 1996 meeting was a public hearing to discuss how to set up a taxing area in which a Tax Increment Financing ("TIF") plan would work. *Id.* at 45. King testified:

Pl.'s Att'y.: What did [Oswald] say to you and what can you say to him, as best you can recall?

King: One of the instances we talked, one of the point-blank questions I asked him in the discussion was, "I don't understand. We've got Crestland, we've got the City of Creston, we've got the college. Who do you work for?"

Pl.'s Att'y.: And what did he say to you.

King: He said "I work for you, Union County," eyeball to eyeball that's what the man told me.

Pl.'s Att'y: What did he say he was going to do for you, if you recall?

King: He said he would take care of all financial aspects of the county and make sure the county's financial end would be covered because our board, along with myself, had very big concern. We have a county attorney, but past attorneys don't do financial work. We are the fiscal agents for the county. We had no expertise in doing something like this.

Pl.'s Att'y.: Who had the expertise in that room to do the public financing?

King: Mr. Oswald.

. . .

Pl.'s Att'y.: Did Mr. Oswald tell you anything about his—Piper's expertise at this meeting?

King: He said he was the very best, and I didn't have anything to worry about.

Pl.'s Att'y.: The very best at what?

King: As a financial consultant, and he would lead us through this whole—he was our financial advisor and would lead us through this whole project.

Pl.'s Att'y.: Mr. King, did Mr. Oswald tell you he was just going to be an underwriter for the county, that his services was going to be limited to just buying and selling county debt?

---

4. The parties provided the Court with only small portions of the trial transcript. Accordingly, the Court's citations to the trial transcript are to the unedited Real Time version provided to the Court by the reporter.

5. The December 8 trial transcript is divided into two portions, one for the morning session (the "a.m." portion), and one for the afternoon session (the "p.m." portion).

King: No.

Pl.'s Att'y.: Did he tell you that his services was going to be limited for Union County [unclear from transcript]?

King: No. He said he was our financial advisor, and he would be doing the underwriting, too, but he was our financial advisor.

Pl.'s Att'y.: Did he tell you that he was going to be working for CF Processing?

King: No. Never.

Pl.'s Att'y: Did he tell you he was going to be working for Crestland Cooperative?

King: Never.[6]

Pl.'s Att'y.: Did he tell you he was the financial consultant for the City of Creston?

King: No.

Pl.'s Att'y.: Did he tell you that the city was issuing industrial revenue bonds and he was underwriting those for this financing?

King: No.

*Id.* at 48–51.

Finally, Gerald McLain testified about his belief that Oswald was hired as the County's "financial advisor":

McLain.: What I thought [was that Oswald] was our financial advisor.

Pl.'s Att'y.: How did you come to that understanding?

McLain: Well, when we were—we had a different meetings, as the meeting went along, he was asked through various conversations that we had, and finally it was said "Who do you work for?" I think Mr. King said that. He said "Well, I work for you."

Pl.'s Att'y.: What did you understand that statement to mean Mr. McLain?

McLain: As we went along on that, he would be the man who we would go to for our financial advice.

. . .

Pl.'s Att'y.: Who was assisting you, the board, in connection with the Urban Renewal Plan and the roads and sewer work?

McLain: Well, I was assuming Piper Jaffray would be helping us with that.

Pl.'s Att'y.: How did you come to that assumption? How did you come to that realization?

McLain: Well, we had Mr. Oswald, you know, advising us.

Dec. 10 Trial Tr. at 145–46.

On December 12, 1996, Oswald wrote a follow-up letter that had been requested at the provided:

This letter is to outline our services to the county regarding the proposed issuance of TIF general obligation bonds. We will be assisting the County as the underwriter of the proposed debt.

* We will attend meetings and represent the county as requested, in all aspects of completion of the financing.

* We will assist the County in the creation and completion of a development agreement.

* We will review the development agreement and recommend areas of concern and suggested strategy.

* We will draft and prepare the offering documents for the securities to be offered.

---

**6.** On cross examination, King admitted that Oswald told the County in a December 12, 1996 letter that "Piper Jaffray had been retained by the developer, which was Crestland Co-op, also in this project." Dec. 8 p.m. Trial Tr. at 27.

\* We will advise and assist in securing a municipal credit rating or credit enhancement insurance, if appropriate.

\* We will make contact with Piper Jaffray's investment executives to describe the securities offering.

\* We will assist the County in investing the proceeds of any securities to be offered.

Our fees will be not greater than 2% of the issue amount, and will be payable only upon completion of the sale of securities.

As you are aware, we have been retained by the Developer to provide financing of the proposed project. We do not believe that this causes us a conflict of interest in assisting the county, however, because the only area of possible conflict is in the actual development agreement and the agreement is drafted and negotiated between the County's attorney and the developer's attorney. The underwriting of debt securities is a special and small portion of the overall project, and our services are to be limited to the structuring and sale of securities.

The Supervisors have requested that we assist in the development agreement to provide analysis of the proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered the developer.

We are comfortable with this responsibility and will covenant not to participate in assisting the developer in negotiating the agreement. As the above noted items are the major points of *financial interest* to the county or any municipality doing a similar type of agreement, these are the only items we would generally advise an issuer regarding. We are comfortable that the County will be adequately represented regarding financial matters.

Pl.'s Trial Ex. 1.

Regarding this letter, Reasoner testified that letter was requested by the Board at the December 9, 1996 meeting:

This was the result of nearly the hour-long public hearing when we were asking a variety of questions, and the question, "Who do you work for?" We had asked, "Can you put that in writing, put that in the form of a letter," something to that effect. And this resulted [in the December 12, 1996 letter].... Basically this is what we wanted.

We were people who were small business owners, we were farmers, we were retired, and we were not financial experts. The fact that we had a firm, such as Piper Jaffray, they're experts, at least that's how it's advertised in world finance, and I know we felt better that we had them agreeing to help us put this project together, whether we should move forward or not, and bullet items were items that we discussed, and I felt that brought a lot of comfort level to the supervisors. Again, we're not experts, but we had someone who was.

Dec. 7 Trial Tr. at 7.

On cross-examination, Reasoner testified that, "[w]hen [he] read the document in totality," he read the bullet points as "highlighting" what Piper's role would be, i.e., that Piper "would help us give us the expertise to make the decision." *Id.* at 103. Reasoner further admitted, however, that Piper's letter never used the phrase "financial advisor" and expressly stated Piper would be the underwriter of the transaction, that Piper's services would be limited to the sale of securities, that Piper was not going to participate in the drafting of the Development Agreement, and that Piper would only "assist in the Development Agreement to provide analysis of the

proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered to the developer." *Id.* at 103–05, 108. Despite these considerations, however, Reasoner maintained that he "recall[ed] feeling that we had a financial advisor, and that [Oswald] put in writing that he would help us through the process, and that's why I felt we were in good hands." *Id.* at 106.

King also testified about the December 12, 1996 letter, stating that he "was pretty much assured that everything we had asked for was covered [in the letter]." Dec. 8 a.m. Trial Tr. at 59. King testified that he read the bullet points in the letter as indicating that Oswald would "be involved in the creation and completion of working with the attorneys to put the Development Agreement together," and that Oswald "would review all the documents and recommend areas of concern that he had from A to Z, throw up a red flag if there was a problem," and that Oswald "would be our financial advisor, and he would take care of our financial and overall project to make sure that it worked." *Id.* at 60–62.

On cross-examination, King admitted that he spent "very little time" evaluating the prudence of the County entering into the project because, in King's view, "I had Tim Oswald involved in this as a financial agent, and that's who we hired. In county government we don't second-guess or go around and double-check our experts." Dec. 8 p.m. Trial Tr. at 36. King further testified that he saw no need to ask for any information because "[n]one was offered. To me that was—things were going well, it was a green light. There was no red flags thrown up." *Id.* at 37.

Finally, McLain testified that he read the last line of the letter, "we are comfortable that we can adequately represent the county" as meaning that Oswald had agreed to act as the County's financial officer. Dec. 10 Trial Tr. at 146–47. McLain read this line as indicating that he "could relax a little and go about my other businesses that I had, and things would be handled in a proper manner." *Id.* at 147. McLain further testified that he believed Oswald was advising the County in connection with the Development Agreement, and that the County hired Piper because if its good reputation and because Oswald "said that he was the best guy to do the job." *Id.* at 148.

### b. *Sufficiency of the evidence.*

■ Based on this testimony and taking the evidence in the light most favorable to the County, as it must, the Court accepts that at all times after receiving Oswald's December 12, 1996 letter, Board members were under the impression that they had hired a financial advisor in Tim Oswald. Indeed, Board members readily admitted at trial that they did virtually nothing to investigate the propriety of committing County resources to the Development Project because they believed that Oswald was watching out for the County's interests alone and would have "thrown up a red flag" if there was something that the County should have been concerned about. *See* Dec. 7 Trial Tr. at 82 (Q: "Between December 9, when you retain, per your testimony, Piper Jaffray, and when you signed the Development Agreement, what due diligence did you do as a county official to try to determine whether this was a good deal for the County?" Reasoner: "I was taking a person's word. I took their word that they were going to advise us and provide us information so we could make a decision.... That's what I did, I took that person, that individual, their reputation at their word."); Dec. 8 p.m. Trial Tr. at 37 (Q: "You didn't ask for any information. We've gone through that before; correct?"

King: "None was offered. To me that was—things were going well, it was a green light. There was no red flags thrown up.").

To evaluate the overall sufficiency of the County's offered testimony on the duty element, it must be viewed in context. The Union County Board of Supervisors never met Oswald or had any conversations or interactions with him prior to the December 9, 1996 Board meeting. Prior to that time, however, County officials had already participated in numerous meetings related to the County becoming involved in the Development Project and had already begun the process of formalizing the County's involvement. Indeed, by November 8, 1996, the outline of the project was sufficiently concrete that Tim Oswald sent a letter to Larry Crosser, the developer of the project, Don Krings, a Union County official, and Joe Parker, a City of Creston official, with a "draft description of the process to complete this project, as well as a time schedule and an updated bond retirement schedule." Trial Ex. 88. At a November 18, 1996 Board meeting, the County formally adopted the preliminary finance plan enclosed in Oswald's letter, which contemplated the County "sign[ing] on to $6.9 million in debt," and assumed a minimum assessment on the plant of $12 million. *See* Dec. 7 Trial Tr. at 95–96, 98; Trial Ex. 756. The Board further agreed at that meeting to have Simmering–Cory draft a development agreement and, in fact, sent a letter to Tom Simmering authorizing him to "go forward to draft a TIF plan [that had] been authorized by the board." Dec. 7 Trial Tr. at 116 (Reasoner); Dec. 8 p.m. Trial Tr. at 20 (King); Trial Ex. 549. Moreover, on August 21, 1996 and on September 11, 1996, an attorney from Ahlers Law Firm attended County Board meetings in relation to the Development Project and billed the County for

his time. *See* Dec. 8 p.m. Trial Tr. at 16–17 (King).

Given that Union County had already approved a preliminary plan of finance, and engaged outside entities to render advice and perform tasks intended to move the project forward, Oswald's "I work for you" statement at the December 9, 1996 Board meeting is not so direct a commitment to act as the County's financial advisor as the County would assert. The County's witnesses recall virtually nothing that Oswald said to them at the December 9, 1996 meeting, other than, "I work for you." There was absolutely no testimony that Oswald asked the County questions about its finances, or that the County provided Oswald with information about its income, debt limitations, or outstanding obligations, as would be expected if Oswald was going to "advise" the County about the propriety of entering into the Development Project. Likewise, there was no testimony that the County and Oswald discussed the scope or extent of Piper's "advisory" duties to the County, that the County told Piper it expected him to inform the County if it was unwise or imprudent to enter into the Development Project, or even that the parties discussed how Piper would be paid for its "advisory" services. When viewed outside of the vacuum in which the County presents it, the County is ultimately asking the Court to permit a legal duty to be imposed upon Piper based merely on the words, "I work for you," coupled with the fact that the County Board members *inferred* from those words that they had employed a financial advisor. To do so would be patently unreasonable and contrary to Iowa law.

To the extent that Oswald's "I work for you" statement is insufficient standing alone, the County relies on Oswald's December 12, 1996 follow-up letter. In par-

ticular, the County repeatedly emphasized at trial the bullet points in the letter, articulating that Piper would "assist the County" and "recommend areas of concern and suggested strategy." The letter, however, never uses the term "financial consultant" or "financial advisor." It also never states that Piper will advise the County about the propriety of entering into the transaction. Rather, the letter states that Piper "will be assisting the County as the underwriter of the proposed debt," that "[t]he underwriting of debt securities is a special and small portion of the overall project, and our services are to be limited to the structuring and sale of securities," that Piper will "represent the county as requested, in aspects *of completion of the financing*," and that Piper will "assist the County in the creation and completion of a development agreement," including "recommend[ing] areas of concern and suggested strategy." After careful review of the letter,[7] the Court does not believe that even coupled with Oswald's "I work for you" statement and Piper's superior financial knowledge, it demonstrates by a preponderance of clear, satisfactory, and convincing evidence, that Piper undertook a duty to "throw up red flags" about the wisdom of the County's involvement in the Development Project.[8]

c. *The County's additional evidence of duty.*

Union County claimed at trial that several additional pieces of evidence further support a conclusion that Piper's actions

---

7. The Court's concerns about the ambiguity of the December 12, 1996 letter in its Order on Defendant's Motion for Summary Judgment were made in the context of the ordinary preponderance of the evidence standard applicable to Plaintiff's negligence and breach of fiduciary duty claims. Under the higher level of proof applicable to a fraud claim, and given that the Court now has the benefit of having heard all the evidence over the course of a two-week trial, the Court does not maintain concern in this regard.

8. The Court finds two other factors particularly worthy of note as further undermining the County's claim of duty in this case. First, by the time the County Board even met Oswald, it was unquestionably aware that Oswald was already in a role that was potentially adverse to the County's interests, i.e., that Piper was playing a significant role in orchestrating and planning the Development Project. *See* Dec. 7 Trial Tr. at 101 (Q: "Now, by the time Mr. Oswald comes in [to the December 9, 1996 meeting], the county supervisors know that he's been working with the City of Creston and the co-op on the financing package that they have, the developer for some time; isn't that right?" Reasoner: "Yes."). However, even if the County was not aware of this fact on December 9, 1996, it certainly must have been aware of *some* potential conflict of interest when Oswald wrote in the

December 12, 1996 letter: "As you are aware, we have been retained by the Developer to provide financing of the proposed project." Trial Ex. 1.

Second, County officials uniformly testified that their constituents wanted this project and that everyone agreed it would be a great opportunity for Union County. *See* Dec. 7 Trial Tr. at 8 (Reasoner testifying: "That's why we got involved because it would help create good jobs in the area, it would also enhance the average price per bushel that the farmer would get for his grain which would be taken to the bean crush plant."); Dec. 8 p.m. Trial Tr. at 16 (Q: "Did any of your constituents come up to you and say, "we don't want you to do that"? King: "Not that I remember." Q: "In fact, they were all in favor of it, and you were under the impression at that time that you were doing something to further something that your constituents wanted to see happen, weren't you"? King: "In a guarded position, yes."). Indeed, Reasoner testified that the purpose of the December 9, 1996 meeting was to engage in "discussion to decide should we do this, should we not do this as a board." Dec. 7 Trial Tr. at 5. The Court is perplexed as to why Piper should have been aware that the County was seeking a "financial advisor" when it appears, by all accounts, to have already been planning to proceed with participation in the Development Project.

throughout the parties' relationship were "in line with" the duty that the County claims Piper owed it. That is, the County contends that actions taken by Piper *after* the December 9, 1996 Board meeting affirm that Piper agreed to be the County's advisor in relation to the Development Project. The Court disagrees that any of this evidence is sufficient, even when considered in light of the December 9, 1996 "I work for you" statement and the December 12, 1996 letter, to meet Plaintiff's burden of proof in this case.

First, the County points out that on December 10, 1996, Piper wrote a letter to John McKinney of Ahlers Law Firm stating, "The Board of Supervisors have instructed us to begin working with you on the process to complete a development agreement and sell G.O. notes." Trial Ex. 553. Nothing about this statement, however, indicates that Piper is "advising" the County. Indeed, the letter does little more than recount the terms that the County had already preliminarily approved and reference that various public hearings will need to be held. *Id.* Second, Piper was asked by Ahlers in a letter dated January 24, 1997 to review a copy of the development agreement and provide its thoughts. Trial Ex. 112A. This letter *to* Piper, however, does nothing to prove that Piper agreed to advise the County. Third, the County points out that Oswald "advised" it to "approve and execute the development agreement" in a letter dated February 28, 1997. Trial Ex. 12. This letter, however, was written by Oswald to *Ahlers*, not to the Board of Supervisors. Moreover, while the letter states once the next required step, a public hearing, is completed, it "would be appropriate to approve and execute the development agreement," the letter also clearly states that Oswald was *not aware* of certain comments that had circulated regarding the Development Agreement—a fact inconsistent with the County's claim that Piper was doing more than acting as an underwriter. *See id.* ("It is my understanding that you have been provided comments on the above development agreement by the developer's attorney, Amy Beattie. I have not heard of those comments, however, I am assuming at this point that they are not substantive with respect to the security offered by the Coop or the County's obligations."). The County also points out that in a July 17, 1997 letter from Oswald to Reasoner, Oswald states that Larry Crosser received some necessary approvals from his bank and told the County "it is time to pick up your process and move it forward." Trial Ex. 16. Though the County presents this statement as "advising" it to move forward, the County's position ignores the context and tenor of the letter overall, which mostly discusses completing the financing project in a timely fashion, with no commentary whatsoever on whether the project is a wise or valuable investment for the County. Moreover, this letter also states that Piper had asked the County "to hold up moving forward with the $4 million cash grant" because Larry Crosser was waiting on some additional approvals. *Id.* According to the letter, "Larry Crosser received word from his bank, First Bank Systems, that they *would guaranty an issue of industrial revenue bonds that will be used to fund the construction of the new soybean plant." Id.* Since the County was never going to issue industrial development revenue bonds, this letter directly undermines the County's assertion that it never had any information that would lead it to believe that entities other than the County were providing funding for the Development Project.

Next, the County points out that a letter dated May 7, 1997 from Ahlers Law Firm to Tim Kenyon states, "At Tim Oswald's

request, we have prepared a second draft of the Agreement between Union County and CF Processing." Trial Ex. 14. The "change" apparently requested by Oswald, however, was that "the City of Creston has now been added as an additional party." *Id.* Moreover, the letter also goes on to request additional information *from Kenyon* that is necessary to complete the Development Agreement. The Court does not find that this letter evidences any advisory duties by Piper. The County also highlights the fact that Oswald organized the activities of various persons involved in the process. *See* Trial Ex. 13 (May 5, 1997 letter from Oswald to Ahlers stating that the Board of Supervisors had "instructed us to begin the process of authorizing an additional cash grant," noting that hearings would need to be scheduled for certain dates, and requesting that copies of documents be provided to Oswald so that he could "get them into the folder I am creating for the County in time to give them one week's review" of documents); Trial Ex. 15 (May 7, 1997 letter from Oswald to Reasoner enclosing a "notebook showing each action item that has been taken so far, and providing room for action items yet to be taken"); Trial Ex. 143 (June 2, 1997 letter from Oswald to Ahlers, providing a copy of a time schedule Oswald provided to the Board of Supervisors); Trial Ex. 152A (August 22, 1997 letter from Ahlers to Oswald thanking him for coordinating the return of executed documents and requesting additional documents). Organizing the project and the players in it, however, cannot be reasonably construed as providing "advisory" services to the County. The County next points to the fact that Oswald appeared at various County Board meetings related to the Development Project. *See* Tr. Exs. 90, 97, 153, 157, 188. The County does not reference, however, the fact that Oswald always appeared at these meetings with Larry Crosser, an agent of the developer. *See* Dec. 7 Trial Tr. at 121. Finally, Piper is listed as "Financial Consultant" in Appendix A of the October 1, 1997 General Obligation Loan Note issuance. Trial Ex. 3 at 9. The category descriptions within the document, however, do not list a financial consultant, and indeed, articulate that Piper is the underwriter on the transaction, with a description of Piper's duties in this regard. *Id.* Moreover, there is no evidence in the record that any County Board member ever saw this reference to Piper as "Financial Consultant," let alone relied on it.

Having reviewed all of the evidence placed before the jury in this case, and resolving all factual disputes in the light most favorable to Union County, the Court is still left with the firm conviction that Iowa courts would not find the "special circumstances" of this case sufficient to support the "duty" element of Plaintiff's fraudulent nondisclosure claim. Plaintiff's evidence, even taken *in toto*, demonstrates nothing more than that Piper said "I work for you," wrote the December 12, 1996 letter, and that Board members inferred that Piper had somehow agreed to advise the County.[9] Accordingly, the Court con-

---

9. At summary judgment, the Court noted with respect to Plaintiff's breach of fiduciary duty claim that "[C]ourts have repeatedly cautioned ... that 'the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.'" Clerk's No. 240, 741 F.Supp.2d at 1104 (quoting *Gemini Investors, Inc. v. Ches–Mont Dis-* *posal, LLC,* 629 F.Supp.2d 163, 168 (D.Mass. 2009)). "Though Iowa courts have not directly stated that there must be "acceptance" of the confidence reposed, they have clearly indicated that the party alleged to owe fiduciary duties must have some awareness or knowledge of the existence of a fiduciary relationship, or otherwise do something to demonstrate assent thereto." *Id.* at 1105 (citing

cludes as a matter of law that the County's evidence is insufficient to support a conclusion that special circumstances gave rise to a duty of disclosure between Piper and the County.

2. *Seventh element—justifiable reliance.*

■■■ Union County's claim of fraudulent nondisclosure required it to demonstrate that the County actually relied to its detriment on Piper's nondisclosures, and that any such reliance was "justifiable." *See Midwest Home Distributor, Inc. v. Domco Indus.*, 585 N.W.2d 735, 743 (Iowa 1998) ("[J]ustifiable reliance is an essential element of fraudulent misrepresentation."). " 'Reliance upon [a defendant's representation] is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations.' " *Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 410 (Iowa 1997) (quoting *Kaiser Agric. Chems. v. Ottumwa Prod. Credit Ass'n*, 428 N.W.2d 681, 683 (Iowa Ct. App.1988)). "Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care should know that the information is false." *Pollmann*, 567 N.W.2d at 410.

■■■ "The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009) (citing *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980)). "Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element is met." *Id.* (citations omitted). Relevant factors in the consideration include:

"(1) the sophistication and expertise of the plaintiff in financial ... matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the ... transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."

*Id.* (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir.1992)). Another relevant consideration is whether the "oral representation clearly contradicts a written agreement. In such instances, reliance on the oral representation by a plaintiff can be utterly unjustified in the face of a clear written contradiction." *Id.* (cita-

---

*Kurth v. Van Horn*, 380 N.W.2d 693, 698 (Iowa 1986) ("We believe in this case that the record fails to show substantial evidence that the customer relied upon the bank for advice in connection with this transaction or that, even if such reliance was placed in the bank, the bank was aware of it.")).

Though the duty at issue in this fraudulent nondisclosure claim is not necessarily a fiduciary one, the Court nonetheless believes that a person charged with a duty to disclose information must have some basis to believe that such a duty is owed. In this case, the record is devoid of any evidence whatsoever that Piper knew that the County was looking to it for financial advice or that the County

expected Piper to "raise red flags." Indeed, the record supports a conclusion that the County's expectations of Piper were unilaterally imposed and that the County never gave Piper any particular reason to believe that the County was looking for advice about the propriety of the transaction. As noted, not one member of the County Board ever asked Piper a question about whether the Development Project was a good idea for the County, whether there was anything to be concerned about in proceeding with the project, whether the County could take additional steps to protect itself or the County taxpayers, or about *anything at all.*

tions omitted); *see also Hammes v. JCLB Props., LLC,* 764 N.W.2d 552, 556 (Iowa Ct.App.2008) ("Under Iowa's subjective test, the issue is whether the plaintiffs, in view of their own information and intelligence, had a right to rely on the representations." (citing *Lockard v. Carson,* 287 N.W.2d 871, 878 (Iowa 1980))).

The Court finds that the evidence presented in this case was insufficient to support the jury's finding that the County justifiably relied on Piper to disclose to it the "alleged nondisclosures" in Final Instruction Number 28. At best, the basis for the County's reliance on Piper to advise it on the propriety of entering into the Development Project was Oswald's "I work for you" statement combined with the December 12, 1996 letter. As discussed previously, however, there is no evidence in the record, save for the December 12, 1996 letter, delineating in precisely what capacity Oswald was going to be working for the County. Moreover, the December 12, 1996 letter itself contains language that should have raised doubts about the County's claimed belief that Piper was acting as a financial advisor. For instance, the December 12, 1996 letter specifically states that Piper will be the "underwriter of the proposed debt" and that its "services are to be limited to the structuring and sale of securities." Trial Ex. 1. Rather than ask for clarification, however, the County ignored this language and forged ahead with its reliance on Piper to "throw up red flags."

The *Spreitzer* factors do nothing but reinforce a conclusion that the County was unjustified in its reliance on Piper. Piper and the County had no prior personal or business relationship, and there was no prior or existing fiduciary relationship between them. While certainly Piper was more experienced than was the County in financial matters, the County Board members tasked with determining whether the Development Project would ultimately move forward were elected governmental officials, most with fairly extensive backgrounds in County governance and with experience in bonding and municipal financing transactions generally, if not in transactions as large as the Development Project.

Moreover, and perhaps most significantly, the County had access, in one form or another, to virtually all of the information they claim Piper failed to disclose.[10] County Board members attended various community meetings about the project and held various meetings of their own, but never asked anyone, including Piper, for additional documentation or information about the project. Further, much of the information that Piper allegedly withheld, including the City's involvement in the project, Piper's representation of other entities in other projects, and information about Crestland's finances, was routinely published in legal notices and other articles in local newspapers. Additionally, information about risks of the operation were either already known to the Board members by virtue of the bean processing plant's start-up nature, or were detailed in non-confidential documents in the possession of the County's bond counsel. *See* Final Inst. No. 20 (knowledge of agent-attorney imputed to Principal).

Although the County has attempted to give the impression that County Board members were little more than simple farmers and small business owners, the fact remains that these individuals were publically elected officials, charged with protecting the interests of the County's

---

10. Piper's brief recites several pieces of evidence that bolster a conclusion that the County's reliance on Piper was not justified. *See* Def.'s Mot. Br. at 14–16.

taxpayers. Even if the evidence in this case could reasonably be said to support an inference that Piper undertook some grand scheme to prevent the County from knowing information that might cause it to decline participation in Development Project—a project that the County and its constituents at all times viewed favorably, and that the County (before ever meeting Oswald) had already tentatively agreed to participate in by its formal adoption of a preliminary finance plan—the County Board members need only have asked a few questions or paid even a bit of attention to the wealth of information available around them to have uncovered the scheme. Instead, there was not one iota of evidence presented at trial that the County officials ever asked a single question about risks of the project, Crestland's finances, or whether security the County had allegedly requested had been obtained. *See* Dec. 7 Trial Tr. at 32 (Reasoner testifying that the Board "took it for granted" that insurance to protect the taxpayers would be obtained), *id.* at 40 (Reasoner testifying: "[W]e made the assumption that we were the major player, we were the players that were helping CF and Crestland make this work."); *id.* at 82 (Reasoner testifying he never asked Crosser how the co-op was doing financially); *id.* at 146 (Reasoner acknowledging that the Board "knew [the project] was a new company and every new company has problems the first—struggles the first few years of existence"); Dec. 8 p.m. Trial Tr. at 36 (King acknowledging that he "did nothing [him]self to assure [him]self that this was a wise decision on [his] part, for the county to enter into this and extend itself on these notes"); *id.* at 37 (King acknowledging that he did not "ask for any information" in relation to the project); *id.* at 41 (King admitting he did not inquire whether insurance had been obtained to protect the taxpayers); Dec. 10 Trial Tr. at 151

(McLain testifying that he "assumed" Piper would get insurance for the taxpayers). Rather, the record reveals that the County did not ask anyone any questions about anything, and instead relied solely on Piper to "advise" it based merely on Piper's "I work for you" comment and on a letter that contained express language indicating that Piper's role would be limited.

The County cites case law supporting a proposition that " 'ordinary business care and prudence' do not require a party relying on professional advice to second guess the advice given. This would 'nullify the very purpose of seeking the advise of a presumed expert in the first place.' " Pl.'s Resistance Br. at 17 (quoting *United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985)). The case law cited, however, arose in the context of professional rendering affirmative advice, such as when "an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists." *See Boyle*, 469 U.S. at 251, 105 S.Ct. 687 (emphasis in original). No such affirmative advice was given in this case. Piper never told the County that investment in the project was a wise decision or that it would be fiscally prudent to proceed with committing funds to the project. Rather, Piper is accused of *failing* to disclose information that might have caused the County to refuse to participate. In this factual context, it would be improper to examine only what Piper allegedly failed to disclose. Indeed, to determine whether the County's reliance on Piper to disclose the allegedly nondisclosed information was justified, it is necessary to examine the entire context of the parties' relationship. Thus, it is highly significant and relevant to the justifiable reliance element that the County and Piper never met one-on-one, never contacted each other with questions or requests for information, never dis-

cussed strategy or the propriety of the investment, and indeed, never really discussed anything at all except what items were legally and practically required to move the project forward.

Viewing the entire context of the parties' dealings, it is clear from the record that the County utterly failed to utilize its ability to observe the obvious, blindly expecting Piper to "throw up red flags," despite that fact that there is no evidence supporting a conclusion that the County ever communicated this expectation to Piper. The Court finds the evidence presented at trial insufficient as a matter of law to demonstrate by a preponderance of clear, convincing, and satisfactory evidence, that the County was justified in relying on Piper to advise it in connection with the Development Project.

### 3. Eighth element—causation.

■■■■■ Under Iowa law, causation has two components: 1) " 'the defendant's conduct must have *in fact caused* the plaintiff's damages (generally a factual inquiry)' " and 2) " 'the policy of the law must require the defendant to be *legally responsible* for the injury (generally a legal question).' " *Scoggins v. Wal–Mart Stores, Inc.*, 560 N.W.2d 564, 567 (Iowa 1997) (quoting *Gerst v. Marshall*, 549 N.W.2d 810, 815 (Iowa 1996)). In conducting the factual inquiry, a court must look to two components: 1) "whether the harm would not have occurred *but for* the negligence of the defendant, and 2) whether the negligence of the defendant was a substantial factor in bringing about the harm." *Id.* (citing *Gerst*, 549 N.W.2d at 817). In eval-

uating whether a defendant's conduct is a "substantial factor" in bringing about the harm sustained, courts must look to the " 'proximity and foreseeability of the harm flowing from the actor's conduct, although it is not necessary that the actual consequences of a defendant's negligence should have been foreseen.' " *Id.* (quoting *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 349 (Iowa 1991)).

■■■■■ In conducting the legal inquiry, the court must determine if " 'the policy of the law will extend responsibility to those consequences which have in fact been produced by an actor's conduct.' " *Id.* (quoting *Kelly*, 476 N.W.2d at 349). Ordinarily, this question can be answered affirmatively where it can be shown that there is "no other rule of law relieving the actor of liability because of the manner in which his negligence resulted in the harm," *id.* (quoting *Kelly*, 476 N.W.2d at 349), and where the resultant harm "result from the risks that made the actor's conduct tortious." *Thompson v. Kaczinski*, 774 N.W.2d 829, 837 (Iowa 2009).[11] The legal inquiry, also known as the "scope of liability" inquiry, is "fact-intensive as it requires consideration of the risks that made the actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks." *Id.*

■■■■■ Piper contends that the County failed to present clear, convincing, and satisfactory evidence of causation. Indeed, Piper asserts that the "County introduced *no* evidence indicating that it would have done anything differently had it been aware of any of Piper's alleged nondisclo-

---

11. Iowa courts historically considered whether a defendant's conduct was a "substantial factor" in bringing about a plaintiff's harm under both the factual and legal inquiries of the proximate cause analysis. *See, e.g., Gerst*, 549 N.W.2d at 815–16. In 2009, however, the Iowa Supreme Court adopted the modi-

fied proximate cause analysis advocated by the Restatement (Third) of Torts, which clearly places the "substantial factor" element in the factual inquiry, and which recharacterizes the legal inquiry as an "assessment of scope of liability." *See Thompson*, 774 N.W.2d at 837.

sures." Def.'s Mot. Br. at 16. Moreover, Piper argues that the County additionally "failed to prove that alternative approaches that would have given the County greater protection, such as a Letter of Credit, were not disclosed, would have been pursued by the County if disclosed, or would have been available if pursued." *Id.*

The County argues in response that County officials "uniformly testified that they would have wanted to know [the allegedly nondisclosed information] in making the decision whether to participate in the CF project, and on what terms." Pl.'s Resistance Br. at 18. As examples, the County contends that Reasoner, King, and McLain each testified as to: 1) a willingness to proceed only if there was no risk to the County taxpayers; 2) a belief that after financing was paid off, the County would have a $19 million commercial venture on its tax rolls; and 3) a belief that Crestland's guarantee was solid.[12] According to the County, "Piper knew otherwise," failed to disclose its knowledge, and the County was harmed as a result.[13] The

12. The County does not offer citations to the trial record in support of its assertions that the Board members so testified. Although the Court is not required to scour the record to find support for parties' claims, even a cursory review of the trial transcript reveals that the County vastly overstates the testimony given by the Reasoner, King and McLain. None of the three ever testified that they would be willing to proceed *only* if there was no risk to the taxpayers. Rather, Reasoner testified simply that "we wanted to create this project but in the back of our mind we were saying we want to make sure the taxpayer is not left holding the bag on this." Dec. 7 Trial Tr. at 12; *see also id.* at 31 ("We wanted to make sure that the taxpayer did not get left holding the bag for a project that others who came before us said was a great project, that you should get involved, it will help the area overall. But we wanted to make sure that those folks who were wanting to bring the project would be the ones who would pay for the project."). King testified that he "would feel more comfortable with insurance to protect the taxpayer.... I did not want the county taxpayers to be on the hook for this." Dec. 8 a.m. Trial Tr. at 54. McLain simply testified that King had explained that "we should have insurance on these bonds to protect the taxpayers of Union County." Dec. 10 Trial Tr. at 151.

Regarding the County's claim that all of the Board members testified that they thought they would have a $19 million commercial venture on the tax rolls after the financing was paid off, Reasoner did testify that he believed that after the termination of the minimum assessment agreement, the property would be "valued at 19 million dollars, that's

what the assessor had determined." Dec. 7 Trial Tr. at 30. The Court can find no similar testimony by either King or McLain. Contrary to Reasoner's cited testimony, however, substantial testimony at trial, including testimony by Reasoner, revealed that everyone involved in the project knew that the $19 million minimum assessment was not reflective of the actual value of the assessed property; rather it was simply the amount that needed to be assessed to ensure tax payments would cover the note issuances. *See, e.g.,* Dec. 7 Trial Tr. at 19 (Reasoner testifying that "we were originally at a lower level as to the amount of value of the plant that would be necessary to make this work. I think it was initially around 10, 12 million dollars, and there's a discussion now that it would be necessary to increase that for this to be viable"); Dec. 10 Trial Tr. at 153–54 (McLain testifying that "It was going to take a $19 million assessment to make the payment of the bonds viable, and if that's what it took, then the minimum assessment would have to be 19 million dollars.");

Finally, regarding Crestland's stability, Reasoner simply testified that "[t]heir reputation in the community was great." Dec. 7 Trial Tr. at 12. King testified that Crestland was perceived at the time as "a pretty viable business" that was "flourishing, that was doing better every day." Dec. 8 a.m. Trial Tr. at 40–41. McLain testified only that he was surprised when Crestland went bankrupt because "I just didn't think that that company was in that kind of shape." Dec. 10 Trial Tr. at 144.

13. The mere fact that Crestland had losses in prior years does not, as the County asserted at

County further argues that it was under no obligation to offer testimony explaining precisely *how* the nondisclosed information, if disclosed, would have altered its decision-making; rather, it was within the jury's province to determine whether to believe the supervisors' testimony that Piper deprived them of the opportunity to make a fully-informed decision on whether to proceed with financing. *Id.* at 18–19.

■ The Court does not agree that the County did not need to present any evidence that the County would have done something differently had it known of the "alleged nondisclosures." Under the County's causation formulation, Piper would be liable to pay for all damages incurred by the County even if County Board members had testified that they would have financed the Development Project regardless of whether they knew of the allegedly nondisclosed information. Such a novel concept is utterly unsupported by case law and would eviscerate the requirements of both factual and legal causation, effectively transforming a fraudulent nondisclosure claim into a strict liability tort.[14] *See, e.g., Reynolds v. Solon State Bank,* No. 07–0085, 2007 WL 4553648, at *5 (Iowa Ct.App. Dec. 28, 2007) (noting in fraudulent nondisclosure claim that plaintiffs had "stated that if they had known the true facts they would not have borrowed money in 1999 or 2002, and would not have purchased the building"); *Determan v. Johnson,* 1999 WL 1072728, at *2 (Iowa Ct.App. Nov. 23, 1999) (stating that the failure of a homeowner to reveal alleged defects to a buyer could constitute fraudulent nondisclosure if "the Defendants were aware of the defects and knew that the Plaintiff was unaware of the defects and could not discover them by ordinary inspection and *would not make the purchase if she knew of the defects*" (emphasis added)).

The Court agrees with Piper that the County has failed to establish that the alleged nondisclosures caused the County's claimed damages. At trial, the County alleged eleven types or categories of information that Piper failed to disclose. *See* Final Inst. No. 28. County Board members, to varying degrees, testified that Piper did not make them aware of the information in those "alleged nondisclosures." The Board members did not, however, testify that any of the alleged nondisclosures, if known, would have caused them to take different action, to seek out different security, or to decline participation in the Development Project. And, there is no evidence in the record that would support an inference that the County *actually could have* obtained any more security on the project that what it actually got.[15] Moreover, on eight catego-

trial, translate into an automatic conclusion, or even give rise to an inference, that Oswald must have known from this fact that Crestland was likely to go bankrupt. In fact, the County never presented any evidence that these losses by Crestland, as opposed to other factors, tipped the balance or even made a substantial impact on Crestland's ultimate bankruptcy filing.

14. The causation element is substantially intertwined with the materiality element of a fraudulent nondisclosure claim. Indeed, the County's lack of testimony indicating that it would have done anything differently in re-

gard to the Development Project also undermines its assertions that the undisclosed information was material.

15. The County contends that Piper deprived it of the opportunity to structure the transaction in a different way, or to get different security, such as a mortgage or a Letter of Credit. The County did not, however, present evidence at trial sufficient to demonstrate that any other structure would have been possible or that any other form of security would have been available. In fact, the evidence at trial does not come close to supporting a conclusion that the financing structure for the project

ries of alleged nondisclosures (the first, second, and fourth through ninth), the County offered *no* testimony that the County Board members considered such information significant or material, let alone testimony that knowledge of the information would have impacted the County's decision-making process in any way. On those eight categories, evidence of both materiality and causation is entirely lacking.

The very little testimony Board members gave indicating that the "alleged nondisclosures" would have been relevant to their decision-making process pertained at best, to *only* the third, tenth and eleventh categories of alleged nondisclosures (the minimum assessment was "high," Crestland's financial losses, and the risks of the project). *See* Final Inst. No. 28. Even on these three categories, however, the testimony was far too speculative to support a finding that the County would not have incurred damage but for Piper's alleged nondisclosures or that Piper's failure to disclose information was a substantial factor in causing damage to the County.

For instance, Reasoner only testified that he would liked to have known about risk factors of the project and Crestland's financial condition, but did not state that the County's decision to participate would have changed in any way:

Q. I'm asking you if you know what are the risk factors, what are the things that you wish, as a county board official, you would have known that you didn't know when you voted to issue these bonds and borrow the money?

A: I wish that someone who had that information had made that aware-

had made us aware of that information.

Q. What information?

A. Information as to the financial condition of the firm they're working with.

Q. Anything else?

A. I can't think so right now.

Dec. 7 Trial Tr. at 144.

Likewise, King testified only that: 1) if given figures about the valuation of the plant, he would have asked Oswald to provide further explanation, and 2) if he had known about Crestland's losses in prior years, he would have taken a closer look at whether the County should be involved in the project:

Q: Would the building and structures figures set forth here have been useful to you in deciding whether or not to enter into the Development Agreement, Mr. King?

A: Yes.

Q. And how so?

A. It would have helped me, if we would have been provided this information by Mr. Oswald, we would have been able to have a more-a view of the things that were going on with the actual setting of the contract and the agreement.

Q. Does seeing this today cause you concern?

A. Yes, it does. I felt that we should have seen this document.

Q. And what would you have done if you had seen this document, Mr. King?

A. Probably asked Mr. Oswald to come in, at that point, come in and go

---

could have been arranged in any other way, that the County could have obtained a Letter of Credit, that Crestland had any property

that could have been mortgaged, or that Crestland would have granted a mortgage to the County in any event.

over it with us and explain the details of it since he was our financial advisor.

. . .

Q. What would you have done with this information [regarding Crestland's financial statements] had Piper shared this with you, Mr. King?

A. Well, if you have a company that was having this kind of trouble, and Piper would have gave us those numbers, we would have had to take a very hard look if we wanted to be involved with this at all.

Dec. 8 a.m. Trial Tr. at 87–88.

Finally, McLain's only testimony on the subject was when he was asked what he would have done if he had been shown records about Crestland's financial losses. McLain stated, "Seeing this loss here on this, I would probably start questioning what was going on, why were we doing—proceeding." Dec. 10 Trial Tr. at 150–51.

Absent any non-speculative evidence that the County could or would have done anything differently had it known the information that Piper allegedly failed to disclose, the Court finds that the evidence presented at trial was insufficient to support a conclusion that Piper's alleged actions caused the County's damages. *See Clark v. Kansas City Missouri School Dist.*, 375 F.3d 698, 701 (8th Cir.2004) (finding that "judgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict" (citations omitted)).

### 4. *Sixth element—intent to deceive.*

■ Piper argues that the county presented no actual evidence, let alone clear and convincing evidence, that Piper intended to deceive the County by purposefully concealing information. Def.'s Mot. Br. at 12. According to Piper, there is no evi-dence in the record that Piper ever knew the County lacked any information. *Id.* Indeed, Tim Oswald testified that, as to each allegedly undisclosed item, he either believed the County already had the information, believed it was not material to the transaction, or was never asked about it. *Id.* Moreover, Piper contends that it is "impossible to reasonably infer, as the County does, that Piper would even believe it *possible* to conceal such publicly available information, when the entire process was being conducted in a public fish-bowl and was the talk of the town." *Id.* at 13.

Plaintiff counters that the jury verdict is amply supported because the "County presented the jury with compelling evidence that Piper intentionally withheld vital information from the County—evidence supporting an inference that these nondisclosures were intentional to secure the County's participation in the project." Pl.'s Resistance Br. at 13. According to Plaintiff, Piper's "omissions and misrepresentations, taken together, comprise a constellation of concealment from which the jury reasonably inferred a design to induce the County to unwittingly serve as the needed source of unsecured 'equity' for the entire CF financing." *Id.* (citing *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986 (8th Cir.1989)).

In 1975, the Iowa Supreme Court discussed the difference between non-actionable silence and a fraudulent failure to disclose:

"The law distinguishes between passive concealment and active concealment, or in other words, between mere silence and the suppression or concealment of a fact, the difference consisting in the fact that concealment implies a purpose or design, while the simple failure to disclose a fact does not. Mere silence is not representation, and a mere failure to volunteer information does not consti-

tute fraud. Thus, as a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed 'suppression,' and therefore is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment.

"Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which, it is asserted, he allowed to remain undisclosed—and the silence must, under the conditions existing, amount to fraud, because it is an affirmation that a state of things exists which does not, and because the uninformed party is deprived to the same extent that he would have been by positive assertion. Concealment or nondisclosure becomes fraudulent only when there is an existing fact or condition, as distinguished from mere opinion, which the party charged is under a duty to disclose.

"Concealment in the sense opposed to mere nonactionable silence may consist of withholding information asked for, or of making use of some device to mislead, thus involving act and intention, or of concealing special knowledge where there is a duty to speak. The term generally implies that the person is in some way called upon to make a disclosure. It may be said, therefore, that in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them."

*Wilden,* 229 N.W.2d at 292–93 (quoting 37 Am. Jur. 2d, *Fraud & Deceit,* § 145).

The Court agrees with Piper that the record does not contain a preponderance of clear, satisfactory, and convincing evidence that Piper intentionally withheld information from the County in order to deceive it into entering into the Development Agreement. While it is true that *Wilden* supports the proposition that intent may be inferred from an individual's failure to disclose material information when that individual is charged with a legal or equitable duty to disclose that information, *Wilden* also requires that the "silence must, under the conditions existing, amount to fraud." In this case, the record simply does not support a conclusion, by a preponderance of clear, satisfactory, and convincing evidence, that Oswald's silence on any of the alleged nondisclosures is sufficient to amount to fraud.

### D. *Conclusion*

The Court does not set aside a jury verdict lightly. However, in this case, the Court is convinced that the evidence is not susceptible to reasonable inferences sustaining the County's position that Piper is liable for fraudulent nondisclosure. Indeed, the Court cannot find a single case, either under Iowa law or under the law of any other jurisdiction, that would support a conclusion that Piper committed the tort of fraudulent nondisclosure on the facts presented in this case. The County's main "evidence" is comprised of little more than the Board members' personal beliefs (unsupported by any real testimony about the

substance of the conversation in which they developed these beliefs) that they had hired a financial advisor, and unsupported speculation that the County might have done something differently if Piper had disclosed various items of information to it. When viewed in the context of everything that occurred both before and after Piper allegedly became the County's advisor, and considering the wealth of information demonstrating that the County essentially ignored everything going on around it in relation to the Development Project, the jury's verdict cannot be permitted to stand.[16]

## II. UNION COUNTY'S MOTION FOR NEW TRIAL ON DAMAGES

 The County's Motion asserts that a new trial on damages is proper because the Court improperly permitted or excluded various items of evidence, and because the Court improperly instructed the jury.[17] Given the Court's conclusion *supra*, however, that the jury verdict cannot be sustained on the County's fraudulent nondisclosure claim, the County's Motion for New Trial on Damages must be denied as moot.

Nonetheless, the Court notes that it has carefully reviewed the arguments by both parties on the issue and would deny the motion even if it had not granted Piper's request for judgment as a matter of law. The Court does not agree with Plaintiff that either its evidentiary rulings on expert testimony or its jury instructions were erroneous or unfairly prejudicial, for reasons stated both in the Court's pretrial orders and in its trial rulings on the parties' evidentiary objections and proposed jury instructions.

## III. CONCLUSION

For the reasons stated herein, Defendant's Renewed Motion for Judgment as a

---

16. There was a plethora of other information at trial that further undermines any possible validity of the jury's verdict in favor of the County on its claim of fraudulent nondisclosure. Rather than discuss it extensively here, the Court references arguments repeatedly asserted by Piper regarding: 1) the County's disclaimer of a financial advisory relationship in the Loan Agreement it signed authorizing Piper to underwrite the bond sale; 2) the fact that the Development Agreement did not discuss insurance, but did contain a merger clause providing that the agreement was the complete agreement between the parties; 3) the fact that agents of the County were aware of and had in their possession numerous allegedly nondisclosed items; 4) the fact that CF·Processing operated and paid its taxes pursuant to the Development Agreement for several years before eventually going bankrupt; and 5) the fact that there is no evidence that Piper knew or even had reason to know that the County was not aware of information the County claims Piper failed to disclose.

17. Federal Rule of Civil Procedure 59(a)(1) provides: "The court may, on motion, grant a new trial on all or some of the issues—and to

any party ... (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." The power to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon*, 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). While a trial court unquestionably has the discretionary power to grant a new trial, the role and function of the jury is not to be trivialized. "The district court can only disturb a jury verdict to prevent a miscarriage of justice." *Beckman v. Mayo Found.*, 804 F.2d 435, 439 (8th Cir.1986) (citing *McGee v. S. Pemiscot Sch. Dist. R–V*, 712 F.2d 339, 344 (8th Cir.1983)).

Erroneous evidentiary rulings warrant a new trial only where they affect "the substantial rights of the parties." Fed.R.Civ.P. 61; *Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1270 (8th Cir.1997). Erroneous jury instructions warrant a new trial only where the objecting party can show that it was materially prejudiced by the erroneous instruction. *See Fink v. Foley–Belsaw Co.*, 983 F.2d 111, 114 (8th Cir.1993).

Matter of Law (Clerk's No. 335) is GRANTED. The jury verdict in favor of Union County on its claim of fraudulent nondisclosure is hereby vacated and the Clerk of Court is directed to enter judgment in favor of Piper Jaffray & Co., Inc. on the claim. Union County's Motion for New Trial on Damages (Clerk's No. 334) is DENIED.

IT IS SO ORDERED.